**DATASCOPE CORP.,**
**Appellee/Cross Appellant,**

v.

**SMEC, INC., Appellant/Cross Appellee.**

**Appeal Nos. 85–812, 85–837.**

United States Court of Appeals,
Federal Circuit.

Nov. 1, 1985.

Ezra Sutton, Woodbridge, N.J., for appellant.

Stevan J. Bosses, Fitzpatrick, Cella, Harper & Scinto, New York City, for appellee. With him on brief were Sidney P. Bresnick and Leonard P. Diana, New York City.

Before MARKEY, Chief Judge, DAVIS, Circuit Judge, and HARVEY, Senior District Judge.[*]

MARKEY, Chief Judge.

Consolidated appeal from a September 24, 1984 judgment of the United States District Court for the District of New Jersey, 594 F.Supp. 1306, 224 USPQ 694 (D.N.J.1984), holding claims 1–8, 18, 19, 21, 22, and 24–27 of Datascope Corporation's (Datascope's) U.S. Patent No. 4,261,339 ('339 patent) valid and infringed, and all claims of Datascope's U.S. Patent No. 4,327,709 ('709 patent) invalid for obviousness, 35 U.S.C. § 103 (1985).[1] We affirm in part and reverse in part.

## Background

### (1) Proceedings in the District Court

Datascope sued SMEC, Inc. (SMEC) on December 23, 1981, alleging infringement of certain claims of its '339 patent and requesting treble damages, interest, costs, and attorney fees. On January 14, 1982, SMEC denied infringement, alleged invalidity of all claims of the patent under 35 U.S.C. §§ 101, 102, 103, and 112, and alleged unenforceability for acts of inequitable conduct during prosecution. SMEC also counterclaimed for damages and an injunction, alleging various acts of unfair competition and antitrust violations. On February 16, 1982 Datascope answered SMEC's counterclaim.

On January 1, 1983, Datascope amended its complaint, alleging infringement of certain claims of its '709 patent. On April 4, 1983, SMEC responded as described above. Datascope answered SMEC's counterclaim on April 20, 1984.[2]

Trial without jury was held on January 9–11, 13, 16–18, February 8–10, and July 10–12, 1984.

On July 12, the district court ordered that proposed Findings and Conclusions be submitted by August 1, 1984, and that closing argument be heard on August 13, 1984. The record does not reflect that either party submitted Findings and Conclusions. Following closing argument on August 13, the district court reserved its decision.

The district court's opinion was filed on September 24, 1984. SMEC filed notice of appeal on October 24, 1984. On October 30, 1984 the district court entered a final judgment order.

SMEC filed a supplemental notice of appeal on November 19, 1985. Datascope filed notice of appeal on November 30, 1984.

### (1) The '339 Patent

Datascope filed an application for "Balloon Catheter with Rotatable Support" on

---

[*] The Honorable James Harvey, Senior Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

1. The district court found that if the '709 patent were valid, liability would exist for infringement of claims 1–3 and 9–15 of that patent. In view of our affirmance, we need not and do not discuss infringement of any claims of the '709 patent.

2. At the request of the parties, the district court deferred the issues raised by SMEC's counterclaims. 594 F.Supp. at 1307 n. 1, 224 USPQ at 695 n. 1. Those issues are not involved in this appeal.

March 6, 1978. The invention related particularly to "inflatable balloon catheters" used in intra-aortic pumping.

Intra-aortic balloon (IAB) pumping was, at the time of the invention, a recognized method of cardiac assistance for a failing heart and of treating cardiogenic shock. It had been used to help wean a patient away from cardiopulmonary bypass, to support a patient during a difficult postoperative period, and to provide pulsation to the linear flow supplied by a cardiopulmonary bypass device. IAB pumping had also been used following myocardial infarction to limit the extension of necrosis and as therapy for angina pectoris.

In the IAB catheter disclosed in the '339 patent, an inflatable balloon chamber[3] portion of a catheter is "tightly twisted into a small cross-sectional diameter", i.e., a diameter generally no greater than that of the inflating gas supply tube of the catheter. That is achieved by supporting the balloon chamber about "support means" of small diameter (described in the specification as a "support wire"), one end of which is "rotatable relative to the chamber wherein the chamber is adapted to being compactly wrapped, rolled or twisted about the support means upon rotation of the chamber which causes swiveling of the support means." The small cross-sectional diameter of the resulting IAB catheter permitted insertion of that device "through small incisions or even by percutaneous insertion," and enabled the catheter to be "guided through smaller and more tortuous canals and passageways."

Claim 1 is representative:

1. A catheter comprising an inflatable and deflatable chamber having a proximal end and a distal end, said chamber in use being adapted to have substantially the same surface area when inflated and when deflated, a catheter tube portion connected at or adjacent an end thereof to the proximal end of said chamber and having a passage communicating with the interior of said chamber for admit-

ting fluid into and withdrawing fluid from said chamber, support means for supporting said chamber extending in said chamber from the distal end thereof to said catheter tube portion and terminating in said catheter tube portion, said support means being non-rotatably connected to one of said ends of said chamber and rotatably coupled to the other of said ends of said chamber to permit relative angular motion between said support means and said chamber when said chamber is twisted about its longitudinal axis such that a configuration of said catheter may be obtained in which said chamber is wrapped about said support means, whereby insertion of said catheter into a body passageway or the like is aided.

### (3) The '709 Patent

The '709 patent, which resulted from a continuation in part of the application that resulted in the '339 patent, claims apparatus and a method for the percutaneous insertion of an intra-aortic balloon into an artery through a sheath. Claim 1 is representative:

1. A system for percutaneous insertion of an intra-aortic balloon comprising in combination:

a flexible hollow sheath having an end adapted to be inserted into an artery of a subject through a puncture,

a balloon catheter comprising

a catheter tube,

a balloon envelope having one end connected to one end of said catheter tube,

an elongated flexible support member within said envelope having one end coupled to the other end of said envelope which is remote from said catheter tube, said envelope folding generally longitudinally along the axis of said support member to have a reduced diameter sufficiently small to be in-

---

**3.** Datascope's application and the '339 patent employ the term "balloon" interchangeably with the term "chamber". For clarity, the text here employs "balloon chamber" throughout.

serted through said sheath into the artery.[4]

## Issues Presented

(1) Whether the district court erred in refusing to hold claims of the '339 patent invalid.

(2) Whether the district court's finding that SMEC's device infringed certain claims of the '339 patent under the doctrine of equivalents was clearly erroneous.

(3) Whether the district court erred in holding the claims of the '709 patent invalid for obviousness.

## Opinion

### I. Validity of the '339 Patent

■ SMEC says the issue on appeal is "whether the trial court erred in finding [sic, holding] the '339 patent valid in view of the prior art." That is not the issue. Nor, under the statute, 35 U.S.C. § 282, can it ever as stated be the issue. This court has spoken of the misconception that there exists some need for courts to hold or declare patents valid: "Patents are born valid." *Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1096 (Fed.Cir.1985), *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1270, 225 USPQ 345, 347 (Fed. Cir.1985). The presumption that the patent is valid, 35 U.S.C. § 282, continues until the validity-challenger has "so carried his burden as to have persuaded the decisionmaker that the patent can no longer be accepted as valid." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534, 218 USPQ 871, 875 (Fed.Cir.1984).

SMEC says: (1) claim limitations inserted to obtain allowance "do not in themselves distinguish over the prior art," because the prior art teaches rotatability between the support means and one end of the balloon chamber; and (2) "it is clear that these claims are obvious,"[5] because the prior art "clearly teaches the alleged differences."

### (1) The Prior Art

### (a) Grayzel Patent

■ SMEC says a juncture between two elements in Figure 2 of Grayzel would have represented a ball and socket joint to one of ordinary skill in the art, and that Datascope's witness Wolvek (one of the inventors) "admitted" on cross examination that Figure 2 depicted a ball-joint.[6]

What SMEC calls an "admission" is a Wolvek statement made with respect to a freehand blackboard sketch by SMEC's counsel at trial, *not* with respect to Figure 2. Counsel's trial tactic substituted a distortion of the prior art for the real thing, an attempt to manipulate the prior art we have found thoroughly improper. *See Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1095. At no time did Wolvek "admit" that Grayzel's disclosure of a rod "attached to" a hollow tube disclosed a ball-joint.

Grayzel's specification neither teaches nor suggests a "ball-joint" or its like. As the district court cogently observed, had Grayzel intended to disclose a rotatable support member, "one would have expected express reference to such a feature, as it would have represented a significant departure from the prior art." 594 F.Supp. at 1311, 224 USPQ at 698. Moreover, SMEC does not and cannot reconcile its present assertions with the statement of its own expert witness, Marzullo, that if Figure 2

---

**4.** Claims 1–15 of the '709 patent are directed to a system or combination of elements facilitating the percutaneous insertion of an IAB catheter. Claims 16–23 are directed to a "method" setting forth steps taken in the percutaneous insertion of an IAB into the artery of a patient.

**5.** The question is never whether "claims are" obvious, but whether *claimed inventions would have been* obvious. 35 U.S.C. § 103.

**6.** SMEC's argument relates to its allegation at trial that Grayzel anticipated the '399 patent.

Anticipation has not been argued on appeal. SMEC says Grayzel's disclosure of a thin support member "clearly teaches that, by 1975, the prior art recognized the use and advantages of a thin support member to enable the balloon of an IAB to be wrapped to a reduced cross-sectional area." As the drawings make clear, however, Grayzel's "wrapping" is entirely different from that achieved by twisting the balloon chamber around its longitudinal axis.

had been intended to disclose a ball-joint, it was improperly drawn.

### (b) Other Prior Art

SMEC says United States Patent Nos. 3,585,983 to Kantrowitz and 3,671,979 to Moulopoulos taught rotation of the balloon chamber with respect to a support member. As the district court properly found, however, Kantrowitz does not teach rotation as that term is taught in the '339 patent. As Dr. Kantrowitz testified at trial, moreover, twisting the wire "braid" disclosed in the Kantrowitz reference tended to damage and eventually destroy the IAB device. Moulopoulos discloses an artificial heart valve having a flexible folding membrane. That reference neither taught nor suggested rotatability as disclosed in the '339 patent, and was not more pertinent than other art that was before the Examiner.

Patents disclosing use of a distendable latex balloon chamber (Tower, Fettel, Fogarty) are cited in SMEC's brief. Those patents were thoroughly considered by the Examiner during prosecution, see American Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1359, 220 USPQ 763, 770 (Fed.Cir.), cert. denied, —— U.S. ——, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984), and no error has been shown in the district court's consideration of them as failing to indicate obviousness. SMEC's assertions respecting drawings of a British Patent, as SMEC says "without reference to the text", distort that art and are thoroughly frivolous.

SMEC is simply wrong in arguing that the claim limitations it attacks were taught or suggested by the prior art.

### (2) Differences

SMEC misperceives the patent law in urging that we focus solely on the "differences" between the subject matter of the claims and the prior art, as though those "differences" were the claimed invention. In Jones v. Hardy, 727 F.2d 1524, 1528, 220 USPQ 1021, 1024 (Fed.Cir.1984), this court said:

> Though it is proper to note the difference in a claimed invention from the prior art, because that difference may serve as one element in determining the obvi-

ousness/nonobviousness issue, it is improper (even if erroneously suggested by a party) to consider the difference as the invention. The "difference" may be slight (as has often been the case with some of history's greatest inventions, e.g., the telephone), but it may also have been the key to success and advancement in the art resulting from the invention.

■ As the district court properly understood, the issue with respect to obviousness is whether SMEC has carried its burden of proving, by clear and convincing evidence, facts from which it must be concluded that one skilled in the art at the time the invention was made would have found it to have been obvious, from the references as a whole, to create the claimed subject matter as a whole. See W.L. Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1552, 220 USPQ 303, 311 (Fed.Cir.1983). The district court's effective determination that SMEC failed to carry that burden in respect of the '339 patent was correct.

### II. Infringement of the '339 Patent

■ SMEC says claim 1 was limited during prosecution to distinguish over prior art on the basis of support means: (1) rotatably coupled to the other end of the balloon chamber, and (2) terminating in the catheter tube portion. SMEC then says it avoids infringement under the doctrine of equivalents because: (a) there is no "coupling" between its support means and the proximal end of its balloon chamber; (b) its support means does not terminate in the catheter tube portion; and (c) its IAB catheter does not perform substantially the same function in substantially the same way.

### (a) "Coupling"

The district court summarily rejected SMEC's contention of prosecution history estoppel in respect of "coupling", saying that SMEC "failed to adduce evidence of [any] rejection whatsoever based on the location of the coupling." 594 F.Supp. at 1314, 224 USPQ at 701. On appeal, SMEC

renews its assertion that its device avoids infringement because its "stylet [support means] freely passes through the proximal end of the balloon without being 'coupled' to it, *as claimed by Datascope* in Claim 1." (Emphasis added.) SMEC's assertion is without merit. Datascope never amended its claims to overcome a rejection based on a particular "location" of the coupling, never argued for patentability on the basis of such location, and did not claim coupling to the proximal end of the balloon chamber (see claim 1, supra).

### (b) Length of Support Member

The SMEC device employs a "long" support member extending through the catheter tube portion and connecting to a "winding means" (to permit manipulation of the balloon chamber). The district court, noting that SMEC's device differed from that disclosed in the '339 patent because "the patent clearly indicates that [the support member] extends from the distal tip of the balloon to a point in the catheter tube adjacent to the balloon chamber," found infringement under the doctrine of equivalents. 594 F.Supp. at 1314–15, 224 USPQ at 701.

SMEC says there were amendments to escape the Tower and Fettel references and that those references showed support members running the full length of the catheter tube. Because the prosecution history shows that "length" of support means in the catheter tube was not a basis for rejection, amendment, or allowance of the claims, SMEC's argument is without merit.[7]

Nor does a reading of the specification bolster SMEC's position. As taught therein, the end of the support means "extends sufficiently into" the catheter tube portion to prevent it from being withdrawn through the opening of the catheter tube portion into the balloon chamber. The concern expressed in the specification with respect to length of support means was thus directed to the minimum, not the maximum, length required to insure proper operation of the IAB.

### (c) Equivalents

The district court's finding that there is no literal infringement has not been shown to have been clearly erroneous. Datascope's burden therefore became one of establishing by a preponderance of the evidence, *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361, 219 USPQ 473, 480 (Fed.Cir.1983), that the SMEC device is an equivalent, i.e., that it performs substantially the same function in substantially the same way to obtain substantially the same result as the claimed invention. *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. at 605, 70 S.Ct. at 854, 94 L.Ed. at 1097 (1950).

The district court found that "the only real difference" between the subject matter of the invention claimed in the '339 patent and the accused device "is that in using the patented device one grasps the distal end of the balloon and rotates the support member by hand instead of turning a knob at the other end of the catheter." 594 F.Supp. at 1314, 224 USPQ at 701. Although the district court characterized

7. The length of support means disclosed in Figures 1 and 6 of the patent drawings as originally filed is identical to that shown in Figures 1 and 6 of the '339 patent as issued. Although SMEC urges us to construe the Examiner's broad language in rejecting a claim "as structurally fully anticipated" as encompassing the "length" of the support means, the prosecution history read as a whole clearly indicates that that was not of concern to applicant or Examiner, and that application of the doctrine of equivalents would therefore not vitiate limitations entered in response to any rejection.

Amendment of claims is a common practice in prosecution of patent applications. No rea-

son or warrant exists for limiting application of the doctrine of equivalents to those comparatively few claims allowed exactly as originally filed and never amended. Amendments may be of different types and may serve different functions. Depending on the nature and purpose of an amendment, it may have a limiting effect within a spectrum ranging from great to small to zero. The effect may or may not be fatal to application of a range of equivalents broad enough to encompass a particular accused product. It is not fatal to application of the doctrine itself.
*Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1363, 219 USPQ 473, 481 (Fed.Cir.1983).

that difference as "an improvement", it held that it did not avoid infringement.

On appeal, SMEC argues that: its balloon chamber does not "freely unwind" inside the body; its device is manipulated entirely from its proximal end, and was designed to elongate the balloon chamber to reduce its cross-section; and its support member and winding knob perform a number of functions not performed by the device of the '339 patent.

SMEC's arguments do not establish that the district court clearly erred in finding infringement under the doctrine of equivalents. SMEC said at trial that its device uses the catheter tube to transmit torque from the support member to the balloon chamber during wrapping, and the district court correctly found that "in this respect the SMEC device does not differ from the patented device." *Id.* at n. 5, 224 USPQ at 700 n. 5. SMEC has not shown clear error in the district court's findings that winding the balloon chamber by manipulating the support member at its proximal end is substantially the same as winding the balloon chamber by grasping its distal end and manually rotating the support member.

As this court and its predecessor courts have stated, "an embellishment" made possible by technological advances may not permit an accused device to escape "the web of infringement." *See Hughes Aircraft Co. v. United States,* 717 F.2d at 1365, 219 USPQ at 483. The district court, which reviewed all evidence of record, found that the differences in SMEC's device do not avoid infringement, citing *Lockheed v. United States,* 553 F.2d 69, 83, 193 USPQ 449, 461 (Ct.Cl.1977). SMEC has not shown that finding to have been clearly erroneous.

### III. Validity of the '709 Patent

The district court acknowledged that the most pertinent art with respect to the '709 system was before the Examiner, but concluded nonetheless that the prior art refer-

ences compelled a holding of invalidity. It noted that "the Grayzel reference discloses every element of the IAB described in claim one of the '709 patent," and that insertion of a catheter through a sheath or cannula "had been described in the medical literature many years earlier." 594 F.Supp. at 1313, 224 USPQ at 700.[8] It also noted that "secondary considerations support a finding of invalidity, since the patent has never been commercialized." *Id.,* 594 F.Supp. at 1313, 224 USPQ at 700.

On appeal, Datascope says the district court erred in: (a) failing to consider the claimed invention as a whole; (b) improperly holding that lack of commercialization militated against validity; (c) undervaluing the statutory presumption of validity because the most pertinent prior art had been before the Examiner; and (d) improperly holding invalid claims not in suit.

### (a) The claimed invention as a whole

Datascope says that before the invention disclosed in the '709 patent, no sheath had ever been used for the percutaneous insertion of an *IAB* catheter into a patient. Conceding that sheaths have been used for years in connection with various medical procedures (e.g., the so-called "Seldinger Technique"), Datascope argues that "no such procedures had previously been available for the insertion of IABs."

Datascope's argument is not persuasive. One of the advantages taught in Grayzel's specification was that because "the [Grayzel] device can be made very much thinner, its insertion in the patient is facilitated reducing the severity of the surgery needed for its insertion." Prior art patent references disclosing sheaths did not specifically teach percutaneous insertion of *IAB* catheters, but percutaneous insertion of other types of catheters was thoroughly described in the prior art literature, e.g., in Seldinger, "Catheter Replacement of the Needle in Percutaneous Arteriography," 39 Acta Radiol 368 (Stockholm, 1953). Data-

---

**8.** The district court used the word "anticipated". Datascope correctly points out that the issue is whether the subject matter of the '709 patent would have been obvious to one skilled in the art at the time the invention was made. 35 U.S.C. § 103. In context, the use of "anticipated" was a mere inadvertence.

scope has not convinced us that the district court failed to consider the invention as a whole, or that it erred when it concluded that one skilled in the art at the time the '709 invention was made would have found it obvious to apply the percutaneous insertion techniques of the sheath references to an IAB catheter of reduced cross-sectional diameter, to gain the advantage of easier insertion discussed in Grayzel.[9]

### (b) Lack of Commercialization

■ It is error to say "secondary considerations support a finding [sic, conclusion] of invalidity, since the patent [sic, the invention] has never been commercialized."[10] Lack of commercialization of an invention cannot alone support a holding of invalidity of a patent on that invention. The error was harmless here, however, where SMEC carried its burden with prior art evidence establishing that the claimed invention would have been obvious, and no showing of commercial success due to the invention in the '709 patent is sufficient to rebut SMEC's showing.

### (c) Presumption of Validity

■ Datascope correctly says that where the most pertinent art was before the Examiner, the validity challenger's burden of overcoming the presumption mandated by 35 U.S.C. § 282, is less easily carried. *See Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1558, 225 USPQ 26, 33 (Fed.Cir.1985); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d at 1359, 220 USPQ at 770. The district court in this case, however, neither ignored nor demeaned the statutory presumption of validity. On the contrary, as made plain in its opinion, it accorded appropriate deference to the Examiner's determination. On the entire record, as above indicated, SMEC carried its burden of proving by clear and convincing evidence facts sufficient to overcome the presumption and to support the district court's conclusion that the '709 patent is invalid.

### (d) Claims in Suit

■ SMEC did not counterclaim for a declaratory judgment of invalidity of all of the '709 patent claims. The district court's holding that the '709 patent is invalid, however, encompassed all claims of that patent. References in pleadings do not suffice to support a judgment that particular claims are invalid, when the specific validity of those claims was not litigated by the parties at trial. *See Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1552, 220 USPQ 193, 201–02 (Fed.Cir.1983). The record provided on appeal does not indicate that the validity of claims 16–23 was litigated at trial, and the district court in its opinion twice recognized that those claims "are not alleged to be infringed." Nor does SMEC in its reply brief refer to Datascope's assertion that the validity of claims 16–23 was not litigated. We therefore reverse the district court's holding of invalidity with respect to those claims. *Vandenberg v. Dairy Equipment Co.*, 740 F.2d 1560, 1568, 224 USPQ 195, 200 (Fed.Cir.1984) ("Each claim must be presumed valid independently of the validity of any other claim.").

AFFIRMED IN PART; REVERSED IN PART.

DAVIS, Circuit Judge, concurring in part and dissenting in part.

I join in Part III (including a, b, c thereof) of the court's opinion ("Validity of

---

9. Datascope asserts that the inventors of the '709 patent were unable "ever to construct a workable device according to the disclosure of [Grayzel]," and that one skilled in the art would not have found in the Grayzel device a structure capable of being inserted percutaneously. Those assertions miss the mark: Whether the Grayzel device could be physically substituted in a combination like that of the '709 patent is irrelevant under 35 U.S.C. § 103. *See In re Yamamoto*, 740 F.2d 1569, 1573, 222 USPQ 934, 937 (Fed.Cir.1984); *Orthopedic Equipment Co. v. United States*, 702 F.2d 1005, 1013, 217 USPQ 193, 200 (Fed.Cir.1983).

10. The district court does not appear to have based its conclusion of invalidity on lack of commercialization alone, but appears to have been merely noting the absence of objective evidence (commercial success) that might support a contrary conclusion.

the '709 Patent") determining the invalidity of the challenged claims of the '709 patent (thus sustaining the district court), as well as joining in Part III, d, reversing the district court's holding of invalidity of claims 16–23 of the '709 patent which were not in issue below. I dissent as to the court's holding (in Part II of its opinion) that the '339 patent was infringed, and because of my position on that issue of infringement I need not, and do not, reach the issue of the validity of the '339 patent (discussed by the court in Part I of its opinion).

On infringement of the '339 patent, my view is that (a) the prosecution history limited claims 1, 18, and 22 to support members which (i) were "rotatably *coupled*" (rather than simply "secured" or "disposed" as in the original claims) to the end of the balloon and also (ii) ended within the catheter tube itself, not beyond it; and (b) accordingly, there can be here no infringement under the doctrine of equivalents because the accused support means (SMEC's stylet) is not so "coupled" (instead, freely passing through the balloon and catheter tube), and likewise does not end within the catheter tube but passes freely beyond and outside that tube.

I take this position on prosecution history estoppel because, after the original claims (which did not contain either of these limitations) were repeatedly rejected over the prior art, after those rejections were continued, and after interviews, the applicant introduced these amendments, and they were accepted. The court refuses to apply prosecution history estoppel because there is no showing that those particular amendments were made to overcome a rejection very specifically referring to the application's predecessor of "coupling" (*i.e.,* "secured" or "disposed"), or to the

length of the support member. However, the examiner broadly rejected the original claims "as structurally *fully* anticipated" by the prior art (emphasis added),[1] and the particular amendments with which we are now concerned were made and accepted only after at least two interviews and earlier amendments which were not enough for the examiner. For me, the pertinent amendments were made to obtain allowance by the examiner (who had theretofore persisted in rejection) and therefore the doctrine of equivalents "may not include within its range anything that would vitiate limitations expressed before the Patent Office." *Autogiro Co. of America v. United States,* 384 F.2d 391, 400–01 (Ct.Cl.1967). This is particularly clear to me with respect to the amendment requiring the support member to terminate within the catheter tube. (The accused device markedly extends beyond the balloon and the catheter tube, ending in an external knob.) The short of it is that, to me, prosecution history should be appraised realistically—to try to discover what actually happened in the particular instance—not by *a priori* rigid or mechanical rules. My judgment in this case is that the two amendments in question were made in a successful effort to overcome rejection on the basis of prior art.

---

1. The examiner also said (referring to two prior patents):

"Both patents show the recited structure of the [original] claims" and "Applicant's remarks have been considered but are not persuasive in view of the broad claim language." These observations seem to refer (*inter alia*) to at least the initial absence of a length limitation.

As for the "rotatably coupled" amendment, the examiner's final rejection (prior to the "rotatably coupled" amendment) said that the earlier Leininger patent "shows a non-plastic chamber having a support connected at one end thereof inherently capable of rotational movement." Thereafter, the "rotatably coupled" amendment was made and accepted.