**DATASCOPE CORP.,**
**Plaintiff–Appellant,**

v.

**SMEC, INC.,**
**Defendant/Cross–Appellant.**

**Nos. 88–1266, 88–1279, 89–1104 and 89–1154.**

United States Court of Appeals, Federal Circuit.

July 6, 1989.

Rehearing Denied Aug. 14, 1989.

Suggestion for Rehearing In Banc Declined Sept. 7, 1989.

Stevan J. Bosses, of Fitzpatrick, Cella, Harper & Scinto, New York City, argued for plaintiff-appellant. Of counsel were Nina Shreve and Errol B. Taylor, of Fitzpatrick, Cella, Harper & Scinto, New York City.

Charles A. Reid, III, of Shanley & Fisher, Morristown, N.J., argued for defendant/cross-appellant. With him on the brief were Arthur R. Schmauder and Renate A. Coombs of counsel, of Shanley & Fisher, Morristown, N.J.

Before MARKEY, Chief Judge, FRIEDMAN and ARCHER, Circuit Judges.

MARKEY, Chief Judge.

Datascope Corp. (Datascope) appeals from a judgment of the United States District Court for the District of New Jersey, 678 F.Supp. 457, 5 USPQ2d 1963 (D.N.J. 1988), requiring SMEC, Inc. (SMEC) to pay reasonable royalty damages of $113,442.05 and finding SMEC's infringement not willful, and from orders for annually compounded prejudgment interest and post-judgment interest at the Treasury bill rate. We affirm-in-part, reverse-in-part, and remand-in-part the court's damage award; reverse the finding of nonwillful infringement; remand for determination of enhanced damages and attorney fees; and affirm the prejudgment and post-judgment interest awards.[1]

## BACKGROUND

Datascope owns United States Patent No. 4,261,339 ('339 patent) on a percutaneous intra-aortic balloon catheter (percutaneous IAB). After this court affirmed the district court's judgment that SMEC infringed the '339 patent under the doctrine of equivalents and had not shown the '339 patent to be invalid, 776 F.2d 320, 227 USPQ 838 (Fed.Cir.1985), the district court conducted a trial on damages.[2] On January 19, 1988, the court issued an order and final judgment that: (1) made the preliminary injunction permanent; (2) awarded $113,442.05 to Datascope, "representing a reasonable royalty, equivalent to 5% of the infringing sales"; and (3) directed SMEC to pay prejudgment interest and costs.

Two days later, the court filed its opinion. Noting 35 U.S.C. § 284's requirement of "damages adequate to compensate" and this court's precedent that a successful claimant may recover its lost profits where it shows it would have made the sales "but for" the infringing activity, see, e.g., Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp., 739 F.2d 604, 616, 222 USPQ 654, 663 (Fed.Cir.1984), the court analyzed whether Datascope was "entitled" to its lost profits or whether it "is entitled only to a reasonable royalty." 678 F.Supp. at 458, 5 USPQ2d at 1964–65. Using the recognized four-prong test of Panduit Corp. v. Stahlin Bros. Fibreworks, 575 F.2d 1152, 1156, 197 USPQ 726, 729–30 (6th Cir.

---

1. SMEC's filing of its "cross-appeal" for the "sole purpose of preserving its right to offer arguments in support of the judgment" is improper. Appellees always have the right to assert alternative grounds for affirming the judgment that are supported by the record. *See Jaffke v. Dunham,* 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957).

2. We do not here explain the involved technology or reproduce the claims in suit, matters fully explored in *Datascope Corp. v. SMEC Inc.,* 594 F.Supp. 1306, 224 USPQ 694 (D.N.J.1984), *aff'd in pertinent part and rev'd in part,* 776 F.2d at 320, 227 USPQ at 838. Further, we presume knowledge of the district court's published opinion on damages, discussing here only those portions particularly relevant to our disposition of the appeal.

1978), the district court denied Datascope its lost profits because it had not "carried its burden of proof in establishing entitlement to lost profits." 678 F.2d at 461, 5 USPQ2d at 1967. The court specifically found that Datascope failed to prove elements two and three of the Panduit test—absence of acceptable noninfringing substitutes and manufacturing and marketing capability to exploit the demand.

The court based the former finding on subsidiary findings that Kontron, Inc.'s (Kontron) dual lumen IAB does not infringe the '339 patent and that it is an acceptable substitute. *Id.* at 460, 462, 5 USPQ2d at 1966–68.[3] It based the latter finding on other subsidiary findings that: (1) "in early 1981 and for a short time thereafter, the market demand for the product was significantly less than it would later become" (678 F.Supp. at 461, 5 USPQ2d at 1967); and (2) Datascope made no showing it could have "captured" SMEC's foreign sales (13% of SMEC's infringing sales), having no sales representatives assigned to foreign customers and never attempting to make inroads "in the area." *Id.* at 461–62, 5 USPQ2d at 1967.

The court stated:

> The evidence clearly shows that many of the sales made [in early 1981 and for a short time thereafter] by SMEC were made because of the doctors' confidence in [SMEC's President] Schiff. Further, the evidence showed that many of SMEC's customers would not have switched from using surgical balloons to percutaneous balloons but for that faith in Schiff.

*Id.*

The court then hypothesized a negotiation between willing licensee and licensor at the time infringement began. It rejected SMEC's suggested royalties of 1.75%, 2.5%, or in the range of 2%–4%, and awarded a 5% royalty because "circumstances as they existed would have compelled willing negotiators to go even beyond a 4% royal-

ty." *Id.* 678 F.Supp. at 464, 5 USPQ2d at 1968–69.

The district court found SMEC's infringement nonwillful. It credited SMEC's obtaining of an opinion of counsel "concerning the validity and possible infringements" of Datascope patents "at a time when Schiff was still attempting to develop his noninfringing prewrapped prototype," *id.* at 464, 5 USPQ2d at 1970, and concluded that "an honest doubt existed as to the validity and infringement of Datascope's patents." *Id.* at 464–65, 5 USPQ2d at 1970. It particularly noted that a panel of this court, "in affirming the judgment of liability was not unanimous." *Id.* at 465, 5 USPQ2d at 1970. Based on its finding of nonwillfulness, the district court denied increased damages under 35 U.S.C. § 284 and attorney fees under 35 U.S.C. § 285.

In supplemental orders, the court awarded Datascope $57,354.18 in prejudgment interest, representing the prime rate compounded annually, and post-judgment interest at the Treasury bill rate. *See* 28 U.S.C. § 1961.

## ISSUES

I. Whether through clear errors of fact and law the district court abused its discretion in awarding damages.

II. Whether the court's finding of nonwillful infringement is clearly erroneous.

III. Whether the court abused its discretion in awarding prejudgment and post-judgment interest.

## I. *Damages*

### A. Standard of Review

Because "[t]he methodology of assessing and computing damages under 35 U.S.C. § 284 is within the sound discretion of the district court, [t]o prevail on appeal [Datascope] must convince us that the district court abused its discretion by basing its

---

**3.** The district court supplied information on the Kontron dual lumen IAB in its opinion in this case, 678 F.Supp. at 460–62, 5 USPQ2d at 1966. More information can be found in *Datascope Corp. v. Kontron, Inc.,* 611 F.Supp. 889, 227 USPQ 320 (D.Mass.1985), *aff'd* 786 F.2d 398, 229 USPQ 41 (Fed.Cir.1986), an ongoing case in which Datascope alleges that Kontron's dual lumen IAB infringes the '339 patent.

award on clearly erroneous factual findings, legal error, or a manifest error of judgment." *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 798, 6 USPQ2d 1878, 1879 (Fed.Cir.1988) (citations omitted).

## B. Lost Profits

Datascope argues errors of fact and law in the district court's determination that it did not prove its "entitlement" to its lost profits as compensation for SMEC's infringement. We review asserted factual errors cognizant of the clearly erroneous standard of Fed.R.Civ.P. 52(a). *See Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541–542, 92 L.Ed. 746 (1948)).

### 1. *Acceptable Noninfringing Alternative*

■■■■ Datascope says the district court's finding that Kontron's dual lumen IAB was an acceptable noninfringing alternative is clearly erroneous. We agree.[4] Perhaps led astray by SMEC's cross-examination of Datascope witness Hanson, which focused only on comparison of the hollow support means of the Kontron IAB and the "rod" or "wire" (hence "solid") support means of embodiments disclosed in the '339 specification, the district court lost sight of this court's repeated caution that it is *claims,* not commercial embodiments, that are infringed. *See, e.g., Amstar Corp. v. Envirotech Corp.,* 823 F.2d 1538, 1545, 3 USPQ2d 1412, 1417 (Fed.Cir.1987). The claims of the '339 patent do not limit "support means" to solid objects and the specification states in several places that illustrations are provided for purposes of "example and not limitation." SMEC proffered no evidence suggesting the propriety of anything other than a plain and ordinary reading of the claims. Indeed, SMEC presented no testimony whatever, but relied entirely on its cross-examination of Hanson.

Also clearly erroneous is the district court's finding that the dual lumen IAB of Kontron could not infringe because the Datascope product if operated as a dual lumen device would cause blood and gas to mix (a "fact" supported in the appendix before this court only by an assertion of counsel). Again, it is the claims that control and the claims of the '339 patent do not limit Datascope to any particular configuration here relevant. Nor has SMEC offered any legal justification whatever for limiting the claims.

Contrary to SMEC's argument in its brief, the district court's finding cannot be supported by the ongoing litigation between Datascope and Kontron. That case has not yet resulted, and may never result, in a finding of noninfringement by Kontron's dual lumen IAB. Moreover, the district court there imposed a preliminary injunction based in part on Datascope's showing of likelihood of success on the merits, and this court affirmed. Nothing in the appeal from that injunction supports a finding here that Kontron's dual lumen IAB is a noninfringing substitute. We are confined here to the record in the case before us. It is beyond cavil that a case is decided on and only on the evidence as presented in that case.[5] Whether Kontron will succeed in submitting evidence in support of noninfringement must await the event.

■■■ Both parties cite non-record, post-appeal events. SMEC says one claim has been rejected on reexamination and Datascope says that rejection has been appealed. Except for noting their impropriety, we disregard both assertions.

We also reject SMEC's argument for affirming the judgment on the alternative ground that the district court was clearly

---

4. Because we agree with Datascope that the court clearly erred in finding the Kontron dual lumen IAB to have been established as a noninfringing alternative, we do not discuss Datascope's argument that its product was superior to Kontron's.

5. That principle will, of course, apply to any supposed relationship between the outcome of this appeal and the ongoing Datascope–Kontron litigation.

erroneous in refusing to find SMEC's 1980 Nontwisting Prewrapped Balloon and "Sidewinder" balloons to be acceptable noninfringing alternatives. As found by the district court, SMEC's President, Schiff, had doubts about the efficacy of the 1980 model (notwithstanding his correctly discounted hindsight testimony at trial) and SMEC never marketed it. 678 F.Supp. at 460–61, 5 USPQ2d at 1966. The Sidewinder needed FDA approval to be marketed, but SMEC did not obtain that approval until October 1984. *Id.* at 461, 5 USPQ2d at 1966–67. SMEC adopts the frequent and foolish appellate ploy of citing only such bits of evidence as may support its view, while ignoring the wealth of evidence that establishes the district court's well reasoned findings to have been not clearly erroneous.

We are surprised at SMEC's reliance on *Smith International, Inc. v. Hughes Tool Co.*, 229 USPQ 81, 1986 WL 4795 (C.D.Cal. 1986), as authority. The district court's judgment in that case was vacated and the case was remanded with instructions to dismiss the complaint because the case became moot on appeal. 839 F.2d 663, 664, 5 USPQ2d 1686, 1687 (Fed.Cir.1988).

Here there were not two permissable views of the Kontron IAB evidence, from which the factfinder chose one. *See Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511. SMEC had the opportunity to proffer convincing rebuttal evidence of noninfringing substitutes but simply did not do so. Further, as discussed above, its cross-examination confused the issue by comparing the Kontron device to Datascope's commercial embodiment instead of to the claims of the '339 patent.

There is, on the other hand, no basis in the record for the district court's view that Datascope failed to prove the absence of acceptable noninfringing alternatives. The only evidence of record is the testimony of Datascope witness Hanson. That testimony, supplemented by Plaintiff's Exhibit PD–4A (a chart comparing elements of the Kontron dual lumen IAB to the '339's claims) was sufficient on this record to carry Datascope's burden of proving that the Kontron dual lumen IAB infringes the claims of the '339 patent. The record developed at trial forces us to the conclusion that the finding that the Kontron device was a noninfringing alternative was clearly erroneous.

### 2. *Manufacturing/Marketing Capability To Exploit the Demand*

The district court based its finding that Datascope had not met its burden of proving manufacturing and marketing capability on subsidiary findings that (1) many of SMEC's customers would not have entered the percutaneous IAB market but for their confidence in SMEC president Schiff; and (2) Datascope would not have made SMEC's sales to foreign customers. Datascope argues that those findings are clearly erroneous. Datascope is right on finding (1) and wrong on finding (2).

### *SMEC's Customers*

■ We note, first, the logical error in considering the preference of customers for the infringer as a source of supply. That preference, if it exists, bears no relevance to element three of the *Panduit* test, which concerns only the manufacturing/marketing *capability* of the patentee to meet the demand. The demand which a patentee must have the capacity to meet is measured by the total sales, by the patentee and the infringer, of the patented product. In this case there is no question that Datascope had the manufacturing and marketing capability and could have sold to every domestic SMEC customer.

Witnesses testified, and the court found, that purchasers of the infringing product prefer to buy from SMEC, rather than from Datascope. (Unsurprisingly, all those witnesses being long-standing SMEC customers.) The court also found, however, that: "SMEC lost customers during the period that Datascope was the only company on the market with the percutaneous balloon" (678 F.2d at 463, 5 USPQ2d at 1969); "the evidence revealed a certain urgency on SMEC's part prior to entering the percutaneous market" (*id.*); and "Schiff

considered Datascope's introduction of a percutaneous balloon to be a significant development in the market." *Id.* at 463, 5 USPQ2d at 1968. Those subsidiary findings undermine the ultimate finding that Datascope had not proven to "a reasonable probability that, but for the infringement, it would have made the sales that were made by the infringer." *Del Mar Avionics v. Quinton Instrument,* 836 F.2d 1320, 1326, 5 USPQ2d 1255, 1260 (Fed.Cir.1988).

SMEC's discussion of the evidence presumes a legitimate choice between two manufacturers of percutaneous IABs. That evidence, however, is irrelevant when, as here, Datascope would, but for infringing devices, have been the sole supplier of percutaneous IABs.

The question at this point in the appeal, rightly stated, is whether SMEC's showing of loyalty of some of its customers overcame the reasonable inference (when the patentee and infringers are the only suppliers of the patented product) that the patent owner would have made the sales made by the infringers. *Id.* (citing *Lam, Inc. v. Johns-Manville Corp.,* 718 F.2d 1056, 1065, 219 USPQ 670, 675 (Fed.Cir.1983)). It did not. The district court found, and SMEC does not challenge the finding, that those sales would have been made by Datascope (albeit later): "[R]egardless of the doctors' high regard for Schiff and SMEC, these doctors would have adopted the percutaneous method because of [its] advantages [over the prior art methods]." 678 F.Supp. at 460, 5 USPQ2d at 1966. The district court also noted (and SMEC admits in its brief) that percutaneous IABs overcame the initial reluctance of doctors and became "the method of choice." *Id.* at 459, 5 USPQ2d at 1965.

█ It is clear that the district court, in arriving at its ultimate finding on element three of the *Panduit* test, applied too rigorous a standard of proof. "The patentee is not obligated to negate every possibility

that a purchaser might not have bought the patentee's product instead of the infringing one, or might have foregone the purchase altogether." *Del Mar,* 836 F.2d at 1326, 5 USPQ2d at 1260. The error in the ultimate finding is further illustrated by the district court's unchallenged findings that: Datascope proved a steadily increasing demand for percutaneous IAB's over the infringing period (678 F.Supp. at 464, 5 USPQ2d at 1969); the percutaneous method is medically superior to the surgical method (*id.* at 459–60, 5 USPQ2d at 1965–66); and the chief impediments to immediate adoption of percutaneous IAB's were inertia and the need for test results. *Id.* 678 F.2d at 459–60, 5 USPQ2d at 1965–66.

█ Our review of the record related to the finding that Datascope failed to carry its burden of proof of entitlement to lost profits on domestic sales under the *Panduit* test leads us inexorably to the "definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948); *see Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511; Fed.R.Civ.P. 52(a). We therefore must reverse that finding.[6]

### Foreign Sales

█ Datascope says the court's finding that it "made no showing that it could have captured the sizable number of foreign sales made by SMEC" is clearly erroneous and asserts that "the only inference that can be drawn from the evidence presented is that Datascope would have made those sales by virtue of Datascope's worldwide presence." We are unconvinced of clear error.

Exactly what Datascope means by "evidence presented" is a mystery. Its main brief contains this: "Datascope sells outside this country as well as within it [A. 952–56], and Datascope even has foreign

---

6. If there were any doubt, and there is none, we would resolve it against SMEC. As this court stated in *Kori Corp. v. Wilco Marsh Buggies & Draglines,* 761 F.2d 649, 655, 225 USPQ 985, 989 (Fed.Cir.) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed.2d 544 (1931)), *cert. denied,* 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985): "Fundamental principles of justice require us to throw any risk of uncertainty upon the wrongdoer rather than upon the injured party."

subsidiaries in Germany, the Netherlands and the United Kingdom." Its reply brief notes, without record citation, "facts" such as its "extensive worldwide presence," and that its "size and reputation," and "substantial advertising" would have led to foreign sales. The court's search of the record found no support whatever for Datascope's oft-repeated statement that it has "foreign subsidiaries". Our search of the record shows that the pages Datascope cites, 952–54 and 956 contain no evidence even touching on foreign sales; page 955 contains the naked statements in an accountant's testimony that "sales are made to customers overseas" and sales to foreign customers "are very significant."

In sum, no "evidence presented" supports Datascope's argument that the only permissible inference was the one it wanted. On the contrary, the record provides clear support for the court's findings that (1) "[a]lthough [Datascope's] sales team was divided into regions throughout the United States, no sales representatives were assigned to foreign customers"; and (2) "no attempt was ever made at making inroads in this area." In view of those findings, we cannot say that Datascope's "evidence," in light of the entire record, was so compelling as to render any contrary view of that evidence implausible. Accordingly, we affirm the denial of lost profits on SMEC's foreign sales. *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511.

### 3. *Conclusion on Lost Profits*

We vacate the award of a reasonable royalty on SMEC's domestic infringing sales and remand for calculation of the appropriate lost profits award. We affirm the court's denial of lost profits on SMEC's foreign sales.

### C. Reasonable Royalty

■ It is undisputed that Datascope is entitled to a reasonable royalty on SMEC's

foreign infringing sales. Pointing to "its policy of not licensing," its 100% control of the percutaneous market when infringement began, "the [large] gross profit margins enjoyed by both Datascope and SMEC on these products" (71% for SMEC), and the entry to sales of other products the percutaneous IAB gave it, Datascope says the 5% reasonable royalty awarded by the district court is "grossly unreasonable, amounting almost to a confiscation" and constitutes an abuse of discretion.

Fairness to the district court requires recognition that it did take into account all of the factors Datascope highlights. Though SMEC's witness presented the only evidence on the standard royalty given for a nonexclusive license in the medical device field, 678 F.Supp. at 464, 5 USPQ2d at 1969 (a finding Datascope does not challenge), the district court recognized the attributes of the patented invention and the effect those attributes would have had on a negotiated royalty rate.[7] The court stated:

> Considering these factors together, the court concludes that even though the evidence indicated that a reasonable royalty in this field ranges from 2% to 4%, I find that the circumstances as they existed would have compelled willing negotiators to go even beyond a 4% royalty. Giving due regard for SMEC's profits, I conclude that willing negotiators would have agreed upon a royalty equivalent to 5% of the infringing sales.

■ Datascope's real gripe therefore is that the district court did not increase the royalty as much as Datascope would have. Were we sitting *de novo* we might also have found a higher rate reasonable. The role of an appellate court is not, however, to substitute its judgment for that of the district court. The court's opinion here makes clear that its judgment was guided by sound legal principles. Thus, we cannot reverse the district court's determination absent a conviction that it committed a

**7.** Because the court recognized the particular attributes of the patented invention and clearly focused on the date infringement began, Datascope's extended attack on the testimony of SMEC's medical field witness is spurious. The

district court accepted that testimony solely as evidence of the standard royalty range in the field. It separately determined how much to exceed that range in compensating for the invention's uniqueness.

manifest error of judgment. As Judge Bissell noted in her additional views in *PPG Industries v. Celanese Polymer Specialties Co.*, 840 F.2d 1565, 1572, 6 USPQ2d 1010, 1016 (Fed.Cir.1988) (quoting Friendly, J., *Indiscretion about Discretion*, 31 Emory L.J. 747, 763 (1982)), a manifest or clear error of judgment occurs "only if we 'come close to finding that the trial court had taken leave of its senses.' Discretion, in this sense, is abused if the record contains no basis on which the district court rationally could have made its decision or if the judicial action is arbitrary, fanciful or clearly unreasonable." Datascope has shown no such abuse.

A vast disparity between actual and hypothetically negotiated profits will rarely be sustainable when the invention was recognized by both parties as highly valuable at the time infringement began and a negotiation is hypothesized. *See, e.g., Sinclair Refining Co. v. Jenkins Petroleum Co.*, 289 U.S. 689, 697–99, 53 S.Ct. 736, 738–739, 77 L.Ed. 1449 (1933). Yet each case must be judged on its own merits in light of the evidentiary record created and introduced by counsel. Datascope's failure even to assert a specific royalty rate it would have accepted or agreed to, let alone sustain and support it with evidence, left the district court without a guidepost for finding a greater royalty and leaves us unpersuaded that its decision was "arbitrary, fanciful or clearly unreasonable" in light of what was presented in the record.

## II. *Willful Infringement*

█ Datascope says the court's finding of good faith is clearly erroneous and "based upon a misconception of governing law." We agree.

In analyzing the "totality of the circumstances," *Central Soya Co. v. George A. Hormel & Co.*, 723 F.2d 1573, 1577, 220 USPQ 490, 492 (Fed.Cir.1983), the district court pointed to the opinion of counsel SMEC sought, saying that opinion "concern[ed] the validity and possible infringe-

ments of patents held by Datascope." 678 F.Supp. at 464, 5 USPQ2d at 1970. That was a clearly erroneous evaluation by the district court. That opinion said nothing whatever about the validity of the '339 patent or any Datascope patent, and the opinion's reference to infringement is not only conclusory, but ignores entirely the question of infringement under the doctrine of equivalents. Further, an opinion on equivalents in this case would have been impossible, SMEC's attorneys having never ordered, let alone consulted, the '339's prosecution history before rendering their opinion. *See Underwater Devices, Inc. v. Morrison–Knudsen Co.*, 717 F.2d 1380, 1390, 219 USPQ 569, 576 (Fed.Cir.1983) (validity and infringement opinion "would generally include an analysis of the file history of the patent.").

Our review of the record convinces us that the district court seriously underestimated Schiff's skepticism regarding the advice of counsel and similarly underestimated the court's own findings about the market pressure and urgency faced by SMEC. *See generally Suessen–Schurr v. Schubert & Salzer*, 829 F.2d 1075, 1084, 4 USPQ2d 1044, 1051 (Fed.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988). Review of the record creates in us the "definite and firm conviction" of mistake in the district court's finding of "honest doubt ... as to the validity and infringement of Datascope's patents."

The district court's reference to this court's 2–1 decision affirming the judgment of liability was inappropriate in this case. That decision was rendered several years after the date infringement began (*i.e.*, the date employed in determining willfulness under the circumstances of this case), *see Great Northern Corp. v. Davis Core & Pad Co.*, 782 F.2d 159, 166–67, 228 USPQ 356, 360 (Fed.Cir.1986); *Underwater Devices*, 717 F.2d at 1389–90, 219 USPQ at 576 (and authorities cited), and was based on facts unrelated to SMEC's decision on the critical date.[8] The dissent was on lia-

---

8. The court's citation of the Seventh Circuit's decision in *Dickey–John Corp. v. International Tapetronics Corp.*, 710 F.2d 329, 348 (7th Cir. 1983) is unavailing. The statement in that case that close questions at trial should ordinarily preclude a finding of willfulness is blunted by

bility, said nothing about willfulness, and was based on the view that infringement under the doctrine of equivalents was precluded by prosecution history estoppel. If SMEC had relied on or even consulted the prosecution history during the period relevant to consideration of willfulness reference to estoppel in the dissent might have relevance. In this case SMEC did not consult the prosecution history. Consequently, the later evaluation of that history in the dissent can neither be attributed to SMEC nor related back to the critical period.

Having been persuaded of clear error in the district court's finding that SMEC's infringement was nonwillful, and having considered the evidence indicating willfulness,[9] we reverse that finding and remand for the court to exercise its discretion in determining the amount that damages should be increased under 35 U.S.C. § 284, which allows an increase of any amount *"up to* three times the amount found." (Emphasis added). We also remand for the court to exercise its discretion in determining Datascope's claim for attorney fees pursuant to 35 U.S.C. § 285.

### III. *Interest*

▮ Datascope complains that the district court "erred in 1) providing for annual rather than quarterly or monthly compounding; 2) using the interest rate set by 28 U.S.C. § 1961 rather than the prime rate for the period after January 21, 1988; and 3) declining to require payment by a date certain."

None of Datascope's arguments convinces us that the court abused "the substantial discretion [it has] to determine the interest rate in patent infringement cases." *Gyromat Corp. v. Champion Spark Plug Corp.,* 735 F.2d 549, 556, 557 (Fed.Cir. 1984). Contrary to Datascope's arguments, the court was entitled to credit

Schiff's affidavit that SMEC would have been unable to comply with any requirement to report royalties more frequently than annually; we are unconvinced here that the Treasury bill rate of section 1961 fails to "adequately compensate" Datascope; and whether a date certain be advisable, a decision not to set such a date is not an abuse of discretion. We therefore affirm the district court's selection of rates for prejudgment and post-judgment interest.

### CONCLUSION

The court's damage award is affirmed-in-part and reversed-in-part. The finding of nonwillful infringement is reversed. The court's orders addressing prejudgment and post-judgment interest are affirmed. The case is remanded for calculation of the amount of lost profits on domestic infringing sales, determination of enhanced damages and attorney fees, and such other proceedings as are consistent with this opinion.

AFFIRMED–IN–PART, REVERSED–IN–PART, and REMANDED.

the subsequent sentences in the opinion which say: "In this case, however, defendants clearly infringed and the only question regarding their good faith was whether at the time of infringement they had a good faith belief in the invalidity of the patent.... [Defendants] will not be permitted to be saved from their flagrant disregard for the patent laws by the fortuity that when the patent in issue was closely scrutinized

in this lawsuit, a close question of obviousness was presented."

9. For reasons not readily apparent, the parties included in the "confidential" briefs the testimony of SMEC's president Schiff relating to the bases for SMEC's decision to infringe after its efforts to design around the patent had failed.