**HOECHST CELANESE CORPORATION**

v.

**BP CHEMICALS LIMITED and Sterling Chemicals, Inc.**

Civ. A. No. G–93–001.

United States District Court,
S.D. Texas,
Galveston Division.

March 8, 1994.

John F. Lynch, Michael Macklin, Arnold White & Durkee, Houston, TX, for plaintiff.

John Christopher Reynolds, Robin C. Gibbs, Gibbs & Ratliff, Houston, TX, Harold Haidt, G. Thomas Delahunty, Brooks Haidt Haffner & Delahunty, New York City, Jack C. Berenzweig, Willian Brinks & Olds, Chicago, IL, for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON POST-VERDICT MOTIONS

KENT, District Judge.

This action came to trial on January 10, 1994, before the Court and a jury. The jury returned a verdict, finding that Defendants BP Chemicals and Sterling Chemicals had infringed U.S. Patent No. 4,615,806 (the '806 patent), owned by Plaintiff Celanese; that such infringement was willful; that the '806 patent was not obvious; that the application for the '806 patent did not fail to disclose the inventor's best mode of practicing the invention, or the identity of co-inventors; and that a reasonable royalty for the use of the invention was six-tenths of one cent per pound of acetic acid produced with the infringing process. Before the Court are the Defendants' motions for judgment as a matter of law and judgment on the issue of inequitable conduct, and Plaintiff's motions for judgment on the

verdict, enhanced damages, permanent injunction, pre-judgment interest, costs, and attorney's fees. To the extent these motions raise issues of fact to be decided by the Court, the following opinion embodies the Court's findings of fact as well as its conclusions of law.

## I. Background

As described in its abstract, the '806 patent generally relates to a method for removing iodide compounds from a non-aqueous organic medium, such as acetic acid, whereby the medium is contacted with a macroreticulated strong-acid cation exchange resin which is stable in the organic medium and has at least one percent of its active sites converted to the silver or mercury form. In particular, the patent covers a process for removing iodides from acetic acid by passing the acid over a "guard bed" of resin beads which have been "charged" with silver. The patent discloses that the preferred resin for the invention is a specific commercially-available product sold by Rohm & Haas under the trademark "Amberlyst 15."

For a stipulated 18–month period in 1992 and 1993, the Defendants produced a stipulated quantity of acetic acid—931,923,636 pounds—by utilizing a guard bed with nearly identical properties and purposes as that described in the '806 patent. The only distinguishing aspect of the Defendants' process was that the Defendants' guard bed used, rather than Amberlyst 15, a commercially-available resin called "Purolite C–145." At trial, the Defendants contended that the use of Purolite C–145 is not claimed by the '806 patent.

## II. Judgment N.O.V.

### A. Infringement

■ The process claimed by the '806 patent requires a "macroreticulated" strong-acid exchange resin which is "stable" in the organic medium. The Defendants contend that no substantial evidence supports the jury's finding that Purolite C–145 is either macroreticulated or stable, as defined in the '806 patent. Accordingly, the Defendants argue that their process cannot infringe the patent as a matter of law.

To prevail on a motion for judgment notwithstanding the verdict, a party must show (1) that reasonable persons, in light of the evidence before them, could not have found the facts necessary to support the jury's verdict; or (2) that the facts properly found cannot in law support that verdict. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821 (Fed. Cir.1992). In reviewing factual findings, the Court must consider all of the evidence, in the light most favorable to the non-movant, drawing reasonable inferences, without simply substituting its choice for that of the jury between conflicting elements in the evidence. *Dana Corp. v. IPC Ltd. Partnership*, 860 F.2d 415, 417 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). In reviewing the legal conclusions implicit in the verdict, the Court should review *de novo* the legal issues supporting the verdict. *Read Corp.*, 970 F.2d at 821.

At trial, the Defendants presented evidence supporting a colorable argument that the '806 patent defines "macroreticulated" in a manner which excludes the Purolite resin. The patent specification defines macroreticulated resins as the "non-gel-type," and further defines gel-type resins as those which depend on swelling for their porosity. Although the Defendants presented no evidence that anyone knowledgeable in the field of resins would call Purolite C–145 a "gel-type" resin, the Defendants nonetheless argue that the patent's definition of this term of art excludes C–145 because some evidence showed that this resin depends on swelling for its porosity.

The jury properly rejected such an overly strained interpretation of the claims of the '806 patent, as the evidence overwhelmingly supported a contrary conclusion. Purolite itself describes its product as "macroporous," a term which the vice-president of Purolite (among others) testified is synonymous with "macroreticulated." The evidence showed that, unlike gel-type resins, C–145 is made with a porogen and, in fact, has substantial porosity when compared to gel-type resins. In contrast, Defendants' evidence that C–145 is not macroreticulated, as defined in the '806 patent, appeared exceeding-

ly dubious. Accordingly, the Court finds that the jury properly applied the evidence to the correct interpretation of the '806 patent in finding that Purolite C–145 is a macroreticulated resin, both as defined in the patent and as defined generally by scientists in the resin field.

In contending that Purolite C–145 is not "stable" as defined in the '806 patent, the Defendants attack the jury's finding on a much closer issue. The '806 patent specification partially defines a "stable" resin as one which will not change more than about 50 percent of its dry physical dimension upon being exposed to an organic medium, such as acetic acid. The Defendants contend that this specification must refer to the resin's *volume* change. When exposed to acetic acid, Purolite C–145 swells with a volumetric increase of slightly more than 100%. Therefore, by the Defendants' interpretation, C–145 is outside the strict limitations of the resin described in the '806 patent. Celanese, on the other hand, argued that the 50% figure refers to the *linear* dimension of the resin beads; by this measure, C–145 is well within the literal terms of the patent.

At trial, the Defendants pointed to substantial circumstantial evidence in favor of their interpretation, such as the inventor's testimony that he had always measured the swelling of resins in terms of volume, not linear dimension. Celanese, however, countered with expert testimony that the word "dimension" does not describe a "volume" measurement; evidence that a limitation of 50% volume swelling would lead to the improbable result that the patent's own "best mode" resin—Amberlyst 15—is excluded from the scope of the patent; and evidence that resin beads are commonly measured by their diameter. Therefore, substantial evidence supports a conclusion that Purolite C–145 is "stable" within the literal meaning of the '806 patent.

■ Moreover, the jury could permissibly have found that the Defendants' use of Purolite C–145 infringed the '806 patent *even if* they believed that the stability require-

ment referred to volumetric changes. Under the doctrine of equivalents, a process infringes a patent, even if each limitation of the patent's claim is not literally found in the accused process, if the accused process performs substantially the same function as that of the patented process, by substantially the same means, to achieve substantially the same result. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). This standard perfectly describes the minimum relationship between the accused and patented processes at issue here.

The evidence at trial showed that the volumetric swelling of Purolite C–145 is the only reasonably arguable distinction between the process used by the Defendants and that described in the '806 patent. Otherwise, the Defendants charged this macroreticulated strong-acid exchange resin with silver, and placed it in a guard bed in order to remove iodides from a stream of acetic acid—just as described in the patent. Even if Defendants' resin choice did not literally infringe the '806 patent, the Court cannot envision circumstances which would more clearly qualify for the protection of *Graver:* the Defendants' process performs the *identical* function of the '806 patent, to achieve *identical* results, by almost (if not literally) the *identical* means. Accordingly, the Court finds the jury's verdict of infringement to be overwhelmingly supported by the evidence.

Alternatively, to the extent this finding is within the exclusive province of the Court, the Court independently finds infringement.[1] To hold otherwise would permit the Defendants "to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law." *Graver Tank,* 339 U.S. at 607, 70 S.Ct. at 856.

### B. Willfulness

■ The Defendants stipulated at trial that they were aware of the '806 patent at

---

1. As both parties note, the issue of whether or not the doctrine of equivalents is properly an issue for the jury or for the Court is currently

before the *en banc* Federal Circuit. *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.,* 1993 WL 502162, Appeal No. 93–1088 (Fed.Cir.).

the time they began using their infringing process. Furthermore, their own testimony established that they knew of the patent when they began trying to develop a means of accomplishing the same result as that achieved by the '806 patent. Finally, the Defendants produced no evidence at trial that they complied with their duty to seek legal advice on the infringement issue before commencing use of their guard bed. This evidence (and lack thereof) is alone sufficient to support the jury's finding that the Defendants willfully infringed the '806 patent, regardless of the Defendants' protests that they had no intention to infringe. *See Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1579 (Fed.Cir.), *modified in part*, 231 U.S.P.Q. 160 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987) (jury entitled to draw adverse inferences from defendant's refusal to produce legal opinions); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1126 (Fed. Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993) (same).

## C. Validity

■ A patent is presumed valid. 35 U.S.C. § 282. Nonetheless, the Defendants argue that the jury's findings on the issues of obviousness, best mode, and inventorship were not supported by substantial evidence. With regard to proof of these validity facts, of course, the Defendants' bore the burden at trial of establishing their existence by clear and convincing evidence. *L.A. Gear,* 988 F.2d at 1123. In light of the evidence adduced at trial, the Defendants' request for judgment on these issues is absurd.

■ Defendants rely primarily on the "Hingorani reference" to support their claim that the subject matter of the '806 patent was obvious in light of the prior art. But the patent examiner considered this very reference before awarding the '806 patent, and evidence of prior art that is cumulative of that considered by the examiner has little probative weight in overcoming the presumption of validity. *See Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995, 998 (Fed.Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). Furthermore, the evidence easily supports the examiner's implicit conclusion that this reference did not render the claims of the '806 patent obvious. The Hingorani reference described a process which: (1) used a gel-type resin, as opposed to the '806 patent's macroreticulated resin; and (2) accomplished the desired result at a rate thousands of times slower than that achieved by the '806 patent. Hence, the jury's conclusion—that the substantially different and more efficient '806 patent was not obvious to one skilled in the art—is far from clearly erroneous.

■ The Defendants' also presented evidence of the patent's "subjective obviousness" to the inventor. This, of course, is direct evidence of nothing. *See Ryko Mfg. v. Nu–Star, Inc.*, 950 F.2d 714, 718 (Fed.Cir. 1991) (test is not subjective obviousness to inventor, but objective obviousness to artisan).

■ Finally, the Court properly excluded evidence of preliminary reexamination findings by the patent office as having little or no probative value, and as being overly prejudicial. The Patent Office grants 86% of all requests for reexamination, but only 12% of these grants result in refusals to find patentable claims. *Output Tech. Corp. v. Dataproducts Corp.*, 22 U.S.P.Q.2D 1072, 1074, 1991 WL 332547 (W.D.Wash.1991). Moreover, the evidence before the Patent Office on reexamination is entirely cumulative of that put before the jury at trial.

The jury was also more than justified in rejecting the Defendants' contentions that the inventor of the '806 patent failed to disclose his "best mode" of practicing the invention, or the existence of "co-inventors". The Defendants' best mode argument is largely founded on an incorrect proposition of law, as discussed in this Court's prior order on the Defendants' motion for summary judgment. The inventorship case evinces only desperation. Accordingly, the Defendants' utterly failed to carry their burden of proving the '806 patent invalid.

## D. Conclusion

The evidence more than sufficiently supported the verdict of the jury. To the extent

relevant findings were within the Court's sole province, the Court completely concurs with the jury's findings and the conclusions they implicate. Therefore, the Defendants' motion for judgment as a matter of law is DENIED.

### III. Inequitable Conduct

■ Defendants also move for judgment on the grounds that the '806 patent is unenforceable due to the inventor's alleged inequitable conduct in prosecuting the patent. Specifically, the Defendants claim that Celanese violated its duty of candor to the Patent Office by failing to disclose known prior art—referred to at trial as the "Leach Patent" and the "Brittish Application"—and by failing to fairly conduct and disclose experiments which Celanese relied upon to distinguish its invention from the prior art.

A party asserting the unenforceability of a patent based on inequitable conduct must prove by clear and convincing evidence that the applicant both (1) failed to disclose material information to the Patent Office, and (2) thereby intended to deceive the Patent Office. *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 991 (Fed.Cir.1988); *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir.1987). With respect to the prior art references, the Defendants attempted to establish both elements of this defense with unrebutted evidence that: (1) both the inventor and prosecutor of the '806 patent learned of the Leach Patent and the Brittish Application during the prosecution of the '806 patent; (2) they both knew that these references were material to the patentability of their claims; and (3) they nonetheless deliberately chose not to disclose these references to the patent examiner.

However, the evidence also clearly established that these papers were less material than, or at most cumulative of, the prior art references which Celanese had already provided to the Patent Office. A patent applicant has no obligation to disclose an otherwise material reference if the reference is cumulative or less material than those already before the examiner. *Halliburton Co. v. Schlumberger Technology Corp.*, 925 F.2d 1435, 1440 (Fed.Cir.1991). Therefore, Cela-

nese's failure to cite these references did not amount to inequitable conduct. *See Rolls–Royce, Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1107 (Fed.Cir.1986).

■ Defendants' arguments as to the experimental data relied upon by Celanese are equally specious. The inventor's highly credible testimony established that the examples were transcribed from his notebook, where he had recorded the results of experiments conducted in the normal course of determining the advantages of his invention. Even if the comparative data given the Patent Office could have been more complete, the Court finds the evidence devoid of proof of an intent to deceive. Accordingly, the Court is far from convinced that Celanese engaged in inequitable conduct in obtaining the '806 patent, and the Defendants' motion for judgment on this basis is DENIED.

### IV. Enhanced Damages and Attorney's Fees

■ Based on the jury's finding of willfulness, Celanese asks the Court to treble the jury's award pursuant to 35 U.S.C. § 284. While the jury's finding permits the Court to make such an award, the decision whether to enhance, and to what degree, is vested in the sound discretion of the Court. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed.Cir. 1992). The decision is guided by factors which overlap those governing the willfulness finding, including: (1) whether the infringer deliberately copied the idea in the patent; (2) whether the infringer investigated the scope of the patent and acted on a good-faith belief that it was not infringing a valid patent; and (3) the infringer's behavior as a party to the litigation. *Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed.Cir.1986). Additional factors the Court might consider are: (4) the defendant's financial resources; (5) closeness of the case; (6) duration of the defendant's conduct; (7) remedial action by the defendant; (8) defendant's motivation; and (9) whether the defendant attempted to conceal its misconduct. *Read*, 970 F.2d at 827.

■ Initially, the Court notes that both the preparation and presentation of this case by trial counsel for all parties manifested the

highest standards of professionalism and talent. Indeed, the Court is unfamiliar with attorneys who could have presented the party's respective positions more persuasively. Accordingly, the Court's opinion as to enhancement should by no means be read as a criticism of the conduct of any trial counsel. Moreover, by this opinion the Court in no way wishes to impugn the subjective conviction of any of the Defendants' agents as to the merits of their case. Rather, the Court's analysis of the enhancement factors focuses solely on the objective reasonableness of those convictions, and on the objective propriety of the Defendants' actions in light of the controlling patent law.

With that caveat in mind, many of the *Bott* and *Read* factors favor enhancement. As discussed above, the evidence at trial clearly established that the Defendants deliberately based their infringing process on the ideas embodied in the '806 patent. By its finding of willfulness, the jury implicitly rejected the Defendants' contention that they acted in good faith in using the infringing process, and the Court agrees. Rather, the Defendants blatantly attempted to avoid an arguably literal interpretation of one relatively unimportant limitation of the '806 patent, with no concern for the fact that their process was clearly the legal equivalent of the invention claimed by the patent. Furthermore, the Defendants presented no evidence that, prior to implementing the accused process, they had sought or obtained the advise of counsel as to whether the process would infringe this patent. Also, while the Defendants claim to have ceased using the infringing process, they attempted to conceal this fact from discovery, and evidence suggests that they have simply shifted their efforts from directly infringing the patent to inducing infringement at a customer's facility. Finally, while the Defendants presented a relatively strong case with regard to the issues of obviousness and claim interpretation, they also pursued numerous defenses which could be generously described as weak.

On the other hand, there are degrees of willfulness, and the willfulness issue certainly presented the closest question at trial. Although the jury found the Defendants' efforts to avoid the patent to be more correctly characterized as an exercise in splitting hairs than as a good-faith effort to meet their duty not to infringe, the Defendants' choice to use the Purolite resin was nonetheless clearly based on *some* argument that this resin's properties fell outside one literal interpretation of an admittedly inexplicit limitation of the '806 claims.

Moreover, the Court is of the opinion that, were it not for the doctrine of equivalents, even the infringement issue would have presented a very close case. This is significant because the doctrine itself defines the very gray boundary between permissible and infringing behavior, in an attempt to resolve the tension between the competing policies of patent protection and innovative competition. The doctrine prevents potential infringers, such as the Defendants here, from freely appropriating patented ideas through hyper-technical interpretations of the patented claims. It conflicts, however, with the policies that a patent should precisely define what is claimed, see *Charles Greiner & Co. v. Mari–Med Mfg., Inc.,* 962 F.2d 1031, 1036 (Fed.Cir.1992), and that competitors should be encouraged to "design around" a patent, see *Westvaco Corp. v. International Paper Co.,* 991 F.2d 735, 745 (Fed.Cir.1993). Accordingly, the Court is of the opinion that maximum punitive damages are less appropriate when a finding of willfulness is largely grounded in the doctrine of equivalents. To find otherwise would be to unjustly reward patentees for their lack of clarity and completeness in drafting their patent.

For these reasons, the Court GRANTS the motion for enhancement to the extent that the damage award should be enhanced by 100%. This figure is calculated to adequately deter infringement of the type at issue in this case, and to attempt to insure that the infringers do not profit from their activities at the considerable expense and inconvenience of the patentee, while acknowledging that this case does not present the extreme circumstances of the most egregious types of patent piracy which would warrant treble damages. Moreover, the Court does not find the facts of the case to be so extraordinary as to warrant the award of both an enhance-

ment and attorney's fees; therefore, Celanese's motion for attorney's fees is DENIED.

## V. Permanent Injunction

 Celanese asks for a permanent injunction against infringement of the '806 patent by the Defendants. Once a patentee has established infringement of a valid patent, the Court may, in its discretion, enjoin further violation of the patent by the infringer. *W.L. Gore & Assoc. v. Garlock, Inc.*, 842 F.2d 1275, 1281 (Fed.Cir.1988). Such relief is generally granted as a matter of course, and should only be denied in the face of "very persuasive [evidence] that further infringement will not take place." *Id.* at 1281–82.

Defendants do not contest the general propriety of an injunction, nor do they make any representations that they would be disinclined to use the infringing guard bed in the future. However, they first ask that the language of the injunction track the language of the '806 patent, beyond the language proposed by Celanese, by including the limitation that infringing resins be "stable in the organic medium." As the Defendants have hotly and unsuccessfully contested the definition of this term, the Court has some trepidation that the Defendants propose this addition solely as an excuse to buttress the possibility of claiming, at some point in the future, the benefit of some supposed ambiguity in the injunction. The Court is confident, however, that other language in the Order clearly indicates—and this Court will not hesitate to so hold—that the Defendants will be in contempt of the Order if they attempt to practice the processes claimed in the '806 patent with any "colorable variation" of Purolite C–145. Accordingly, the Court will sustain the Defendants' objection as to this language. Otherwise, Plaintiff's motion for injunctive relief is GRANTED.

 Defendant's also ask for a stay of the injunction pending final disposition of both this case and the pending reexamination proceeding. To qualify for a stay of injunctive relief pending appeal, a party should show: (1) a strong likelihood of success on the merits; (2) irreparable injury to the movant; (3) the lack of substantial injury to the non-movant; and (4) that the public interest favors a stay. *Standard Havens Prod. v. Gencor Indus.*, 897 F.2d 511, 512 (Fed.Cir. 1990).

 Rather than attempting to meet this test, however, the Defendants merely point out the pendency of reexamination and cite a non-precedential case which suggests the propriety of a stay in these circumstances. Moreover, the evidence presented at trial does not support a stay. As discussed above, it appears highly unlikely that the '806 patent will be ultimately found invalid, either on appeal or reexamination. Furthermore, the Defendants claim that they no longer use the infringing process; indeed, at trial they attempted to minimize the beneficial aspects of the process. Therefore, it would be disingenuous for the Defendants to now claim that an injunction against use of the process would irreparably harm them. Accordingly, the motion for stay of the injunction is DENIED.

Finally, the Defendants ask that the injunction contain language of self-termination in the event of reversal on appeal or a finding of unpatentability in the reexamination proceeding. This request, however, posits itself to speculative circumstances which can be easily addressed, as a matter of law, on their occurrence. Therefore, the request is DENIED.

## VI. Pre–Judgment Interest and Costs

 Celanese requests pre-judgment interest based on the average prime rate of 6% for the relevant period, compounded monthly, based on an assumption that royalty payments would have been made quarterly. The Defendants suggest that the interest rate should be based on the average three-month United States Treasury Bill rate of 3.21%, compounded quarterly.

 The Court has substantial discretion in determining the pre-judgment interest rate in patent infringement cases. *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 829 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 747 (1990). In making this determination, the Court is

mindful that the purpose of pre-judgment interest is solely to compensate the patentee for the lost use of the royalty income he should have been paid. *Bio–Rad Laboratories v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed.Cir.1986), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3187, 96 L.Ed.2d 675 (1987). Accordingly, the Court finds the T-bill rate to be the appropriate standard, and the Court adopts the Defendants' calculations for pre-judgment interest through the end of 1993—$151,526.00.

■ Defendants also argue that pre-judgment interest should only be awarded through January 21, 1991—the date of the verdict—on the grounds that Celanese's right to recovery was established on that date and hence the appropriate relief after that date is post-judgment interest. Given the Court's determination that the T-bill rate is the appropriate standard for pre-judgment interest in this case, however, this distinction makes little, if any, real difference in total liability. *See* 28 U.S.C. 1961(a) (post-judgment interest established by the 52–week T-bill rate). Moreover, the jury's verdict did not entirely dispose of the issues in this case, as the outcome of the Defendants' equitable defense has not been decided until today. Therefore, before today Celanese's right to recovery had not been finally established. Accordingly, additional interest through today's date will be awarded at the rate of 3.25%, uncompounded, for a total prejudgment interest award of ($151,526 + ((5,591,-541.82 + 151,526.00) × .0325 × 67/365)) = $185,787.72.

Celanese's bill of costs is also allowed, in the amount of $24,801.20.

\* \* \* \* \* \*

In sum, the Defendants' motions for judgment are **DENIED**. Plaintiff's motion for enhanced damages is **GRANTED** to the extent that the damages award will be doubled. Plaintiff's motion for attorney's fees is **DENIED**. Plaintiff's motion for a permanent injunction is **GRANTED**. Pre-judgment interest is **AWARDED** in the amount of $185,-787.72, as is Plaintiff's bill of costs in the amount of $24,801.20.

If the parties can present to the Court compelling and relevant new evidence or legal authority affecting these issues, which they could not through the exercise of due diligence have presented on original submission of these motions, the parties are, of course, invited to bring these to the Court's attention. Otherwise, the parties are **ORDERED** to file no further pleadings in this Court, including motions to reconsider or the like. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals, as may be appropriate.

IT IS SO ORDERED.